FILED
2026 JAN 28 01:26 PM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 26-2-03936-4 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

| | |
|---|---|
| MALIKA BENNETT and MARIAH MEADE, on behalf of themselves and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CRICUT, INC.,<br><br>Defendant. | No. ______________________<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiffs Malika Bennett and Mariah Meade, on behalf of themselves and on behalf of others similarly situated, on information and belief except to their own experiences and matters of public record, complain of Defendant Cricut, Inc., as follows:

## I. INTRODUCTION

1. In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).

2. Among other things, CEMA prohibits transmitting a commercial email to a



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Washington resident's email address that "[c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

3. Defendant Cricut Inc. ("Cricut") engages in the precise activity which CEMA prohibits.

4. Cricut spams Washington consumers, including Plaintiffs, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with Cricut marketing for fear of missing out. It also floods consumers' email inboxes with repeated false notifications that the time to act—*i.e.*, *purchase*—is short.

6. And through this deceptive time-sensitivity, Cricut falsely narrows the field—steering consumers away from shopping for better deals—to its own products that must be purchased *now*.

7. Plaintiffs challenge Cricut's harassment of Washington consumers with deceptive marketing as violations of the Commercial Electronic Mail Act (CEMA), RCW 19.190, and the Consumer Protection Act (CPA), RCW 19.86, seeking damages for injuries caused and injunctive relief against such violations in the future.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction of this case under RCW 2.08.010.

9. Venue is proper in King County under RCW 4.12.020(3) because Plaintiffs' cause of action, or some part thereof, arose in King County.

## III. PARTIES

10. Plaintiff Mariah Meade is a resident of Pierce County, Washington.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

11. Plaintiff Malika Bennett is a resident of King County, Washington.

12. Defendant Cricut, Inc., is a corporation incorporated in Delaware with its principal place of business at 10855 S River Front Parkway, Suite 300, South Jordan, Utah 84095.

## IV. FACTUAL ALLEGATIONS

### A. CEMA protects Washington consumers from deceptive spam emails.

13. The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).

14. In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

15. In the nearly three decades since, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

16. The problems, however, are not limited to email content. Subject lines of emails are framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

17. In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

18. In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

19. Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice"



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

20. Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

21. This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

22. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.

23. The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

24. CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

25. CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.

26. CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

facilitating commerce “by eliminating fraud and deception.” *Id.*

27. CEMA “mean[s] exactly what it says”: in “broad” but “patently clear” language, CEMA unambiguously prohibits “sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails.” *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

28. CEMA’s protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

29. The statute’s only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B. The subject lines of Cricut marketing emails make false time scarcity claims.**

30. One common way online marketers “manipulate consumer choice by inducing false beliefs” is to create a false sense of urgency or to falsely claim that consumers’ time to act is scarce. Fed. Trade Comm’n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

31. The FTC has identified the “False Limited Time Message” as one example of false time scarcity claims, in which the marketer creates “pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached.” *Bringing Dark Patterns to Light*, *supra* para. 29, at 22.

32. “False or misleading scarcity claims can change the behaviour of consumers.”



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

*Online Choice Architecture, supra* para. 29, at 27.

33. Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Consumer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

34. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 29, at 26.

35. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*

36. Under time pressure, "consumers might take up an offer to minimise the uncertainty of passing it up." *Id.*

37. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

38. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

39. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

40. Cricut sells hobbyist materials and tools for textiles like cutting machines, heat



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

presses, and related products through its website, https://cricut.com/en-us/.

41. To advertise its products and encourage online purchases Cricut frequently sends spam emails to consumers with misleading and deceptive subject headings.

42. **Urgent Spam Emails.** Unfortunately, for those recipients, Cricut regularly titles its emails with urgent subject headings that do not reflect the true availability of the advertised deal. This strategy is demonstrated in the examples below.

43. Cricut's deceptive strategy is no more readily apparent than in its promotion revivals. In these examples, Cricut periodically warns consumers that their time to benefit from a promotion is almost over. Then, within a short time, Cricut revives the same offer, thereby demonstrating the falsity of its previous time scarcity claims.

44. This misleading marketing strategy allows Cricut to maximize sales during the life of a promotion and the subsequent revival. By using false deadlines, Cricut's approach prevents consumers from making informed purchasing decisions.

45. An example of Cricut's strategy occurred in September 2024 during their sale on the Cricut Joy model cutting machine.

46. On September 21, 2024, Cricut sent out an email with the headline: "$80 Off Deal Ends Tonight! Save BIG on Cricut Joy."

47. Just three days later, on September 24, 2024, Cricut sent an email with the headline: "Shop Machines Under $100," again offering an $80 savings on Cricut Joy.

48. Despite the clear warning communicated in the "deal ends tonight" subject line, consumers would have considerably more time to obtain the advertised discounts on the Cricut Joy cutting machine.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

49. The September 2024 promotion is but one example of Cricut's long-standing false time scarcity claims.

50. Previously, it did so on September 23, 2023, regarding a cutting machine sale, in an email titled: "Cricut® Cutting Machine SALE — Ends Tonight." The promotion offered discounts on various models of cutting machine including $50 off of the Cricut Joy cutting machine, $30 off of the Cricut Maker 3 cutting machine, and $20 off of the Cricut Explore 3 cutting machine.

51. Despite the clear statement and warning in the "Ends Tonight" subject line, the promotion was not ending that night. In truth, consumers would have considerably more time to obtain the advertised discounts.

52. On September 28, 2023, mere days later, Cricut returned to consumers' inboxes to announce a new sale with an email titled: "Don't Sleep On Limited-time Machine Deals," recycling the same offer of $50 off of the Cricut Joy cutting machine, $30 off of the Cricut Maker 3 cutting machine, and $20 off of the Cricut Explore 3 cutting machine..

53. Cricut continued to use the same deceptive marketing practices the following year.

54. On June 26, 2025, Cricut sent an email to consumers advertising another sale with the subject line: "Bundle Sale Ends TODAY!! Don't miss up to 40% off."

55. Yet, just five days later, on July 1, 2025, Cricut emailed consumers advertising another sale with the headline: "SHOP OUR BUNDLE SALE - Take up to 40% off!"

56. The subject lines in the June 26, 2025, email was misleading because the promotion was not ending on June 26, as Cricut said. The deal was offered a few days later, directly contradicting the "sale ends today" warnings deployed on June 26.

57. Cricut has used other deceptive practices in its promotions as well.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

58. For example, Cricut uses fake promotion extensions. It announces promotional pricing, presenting that pricing as a scarce or time-limited opportunity. Once the advertised deadline has ostensibly passed, Cricut "extends" the promotion to a new end date.

59. Cricut did so for its Cyber Monday sale on December 2, 2024, in an email with the subject line: "Last Chance for Cyber Monday Deals." But December 2 was not the last chance for consumers to obtain those deals.

60. The very next day, on December 3, 2024, Cricut emailed consumers with the subject line: "We've Extended Cyber Monday[.]"

61. Thus, one day after warning consumers that it was their last chance to access the Cyber Monday deals, Cricut purported to extend the sale, showing that the information in the December 2, 2024, subject line was false and misleading. The false deadline was simply a marketing strategy meant to compel consumers to purchase items from the Defendant's website faster.

62. Cricut used the same technique when advertising for its bundle sale on its Cricut Maker 4 model cutting machine in September 2024.

63. On September 10, 2025, Cricut warned customers that the promotion was set to expire in an email titled: "Cricut Maker® 4 bundle deal ends TODAY[.]" But it wasn't the final day for this promotion.

64. On September 11, 2025, the very next day, Cricut again spammed consumers with an email with the subject heading: "Oopsie! Did we do that? We messed up. You win. The sale is extended today only." The body of the email offered the same bundle deal on the Cricut Maker 4 model cutting machine.

65. The information contained within the subject heading of Cricut's email on



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

September 10 was false and misleading. The promotion was not ending that day.

66. These "extensions" are not done by happenstance. They reveal a coordinated marketing strategy designed to gin up consumer urgency about a promotion ending when in fact it is not ending.

67. Another example comes from Cricut's Black Friday sale in November 2025.

68. On November 28, 2025, Cricut sent consumers an email with the subject line: "FINAL HOURS: Black Friday deals are wrapping up[.]" The body of the email included a count down clock indicating the Black Friday promotion ended at midnight that same night.

69. Yet, the very next day, on November 29, 2025, Cricut emailed consumers with the subject line: "OMG! Black Friday's still going[.]"

70. OMG indeed. Contrary to Cricut's "FINAL HOURS" invocation on November 28, consumers in fact had additional time to make use of the Black Friday promotion. The email on November 28 was misleading because its subject line contained false information designed to make consumers feel urgency based on incorrect information.

71. Cricut repeated this trick the following month in December 2025.

72. On December 1, 2025, Cricut sent an email advertising its Cyber Monday sale with the subject line: "LAST CHANCE! Cyber Monday ends tonight[.]"

73. December 1, however, was not the "LAST CHANCE" for Cyber Monday deals.

74. On December 2, 2025, Cricut emailed consumers with the subject line: "Cyber Monday's still going!"

75. Cricut's misinformation strategy also includes informing consumers that a sale is ending only to advertise a better offer soon thereafter.

76. On March 22, 2025, Cricut transmitted an email with the subject line: "Our Bundle



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Sale Ends TONIGHT 💔 Up to 25% off bundles now!"

77. However, Cricut was quick to offer a better deal just days later.

78. On March 28, 2025, Cricut advertised a better discount in an email titled: "Oh, Boy! It's a Bundle Sale [.]" The body of the email offered consumers up to 40% off on a Cricut machine bundle. Thus, the new bundle sale provided consumers with improved pricing.

79. This false time scarcity manufactured by Cricut might compel a consumer to take urgent action and purchase a product using the 25% off discount, only to *miss out* on the 40% off deal offered just days later.

80. In short, Cricut engages in a different email marketing strategies whereby it creates a false sense of urgency, misrepresents when sales end, and then arbitrarily extends those sales to further pull in consumers with subject headings that are just not true.

81. These and other examples of Cricut commercial emails whose subject lines contain false or misleading statements are attached to this Complaint as Exhibit A.

**C. Cricut knows when it sends emails to Washington residents.**

82. A sophisticated commercial enterprise, like Cricut, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly with its knowledge.

83. First, the sheer volume of Cricut email marketing put it on notice that Washington residents would receive its emails.

84. Second, Cricut may obtain location information tied to email addresses when consumers make purchases from Cricut through digital platforms, including Cricut website, or otherwise self-report such information to Cricut.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

85. Third, Cricut may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Cricut emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

86. Fourth, Cricut may obtain location information tied to email addresses through the use of sophisticated marketing and analytics platforms. Specifically, to manage its email marketing campaigns, Cricut appears to use Braze, a "leading customer engagement platform that's passionate about helping brands forge lasting connections through engaging customer experiences."[1] Braze will supply it by tracking and logging user activity when users interact with Cricut.[2] Braze compiles "real-time and historical device, location, navigation, events, search, session history, and other inputs" to create customer profiles both known and anonymous website users.[3]

87. Fifth, Cricut may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

88. Sixth, Cricut may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

89. Seventh, Cricut may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See*

---

[1] *Company*, BRAZE, https://www.braze.com/company (last visited Jan. 21, 2026).

[2] *Retail & eCommerce*, BRAZE, https://www.braze.com/solutions/retail-and-ecommerce (last visited Jan. 21, 2026) (describing data collectible by integrating Braze's software into websites and mobile applications, including behavior, purchase, and demographic data)

[3] John Dinh, *How Braze Supports the Flexible Identification of Both Known and Anonymous Users*, BRAZE, https://www.braze.com/resources/articles/building-braze-how-braze-supports-flexible-user-identification (last visited Jan. 21, 2026).



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

RCW 19.190.020(2).

90. It is thus highly probable that a seller of Cricut's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

**D. Cricut violated Plaintiffs' right under CEMA to be free from deceptive commercial emails.**

*Plaintiff Mariah Meade*

91. Cricut has bombarded Plaintiff Mariah Meade with commercial emails whose subject lines contain false or misleading statements in violation of her right to be free from such annoyance and harassment under CEMA.

92. For example, Plaintiff Meade received emails containing false or misleading subject lines sent by Cricut, as described above in Section B. These messages were sent to Plaintiff Meade's personal Gmail address:

93. Plaintiff Meade received the June 26, 2025, email titled "Bundle Sale Ends TODAY!! Don't miss up to 40% off."

94. Plaintiff Meade received the September 10, 2025, email titled "Cricut Maker® 4 bundle deal ends TODAY[.]"

95. Plaintiff Meade received the November 28, 2025, email titled "FINAL HOURS: Black Friday deals are wrapping up[.]"

96. Plaintiff Meade received the December 1, 2025, email titled "LAST CHANCE! Cyber Monday ends tonight[.]".

97. These emails contained false or misleading subject lines, in violation of CEMA, that misrepresented the timing and availability of promotional offers, and therefore, fundamentally, Cricut prices.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

98. Put differently, the emails Plaintiff Meade received contained false or misleading statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

*Plaintiff Malika Bennett*

99. Cricut has also bombarded Plaintiff Malika Bennett with commercial emails whose subject lines contain false or misleading statements in violation of her right to be free from such annoyance and harassment under CEMA.

100. For example, Plaintiff Bennett received emails containing false or misleading subject lines sent by Cricut as described above in Section B. These messages were sent to Plaintiff Bennett's personal Gmail address:

101. Plaintiff Bennett received the September 10, 2025, email titled "Cricut Maker® 4 bundle deal ends TODAY[.]"

102. Plaintiff Bennett received the November 28, 2025, email titled "FINAL HOURS: Black Friday deals are wrapping up[.]"

103. Plaintiff Bennett received the December 1, 2025, email titled "LAST CHANCE! Cyber Monday ends tonight[.]"

104. These emails contained false or misleading subject lines, in violation of CEMA, that misrepresented the timing and availability of promotional offers, and therefore, fundamentally, Cricut prices.

105. Put differently, the emails Plaintiff Bennett received contained false or misleading statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

## V. CLASS ACTION ALLEGATIONS

106. Plaintiffs bring this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington residents holding an email address to which Defendant sent or caused to be sent any email listed in Exhibit A during the Class Period.

107. Excluded from this definition of the Class are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiffs; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

108. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

109. Plaintiffs reserve the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendant sent or caused to be sent during the Class Period to email addresses held by Washington residents.

110. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

111. There are questions of law or fact common to the class, including without limitation whether Defendant sent commercial emails containing false or misleading information in the subject line; whether Defendant sent such emails to email addresses it knew or had to reason to know were held by Washington residents; whether Defendant's conduct violated CEMA; whether Defendant's violation of CEMA constituted a *per se* violation of the CPA; and whether Defendant should be enjoined from such conduct.

112. Plaintiffs' claims are typical of the Class's because, among other reasons, Plaintiffs



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

and Class members share the same statutory rights under CEMA and the CPA, which Defendant violated in the same way by the uniform false or misleading marketing messages it sent to all putative members.

113. Plaintiffs will fairly and adequately protect the Class's interests because, among other reasons, Plaintiffs share the Class's interest in avoiding unlawful false or misleading marketing; have no interest adverse to the Class; and have retained competent counsel extensively experienced in consumer protection and class action litigation.

114. Defendant has acted on grounds generally applicable to the Class, in that, among other ways, it engaged in the uniform conduct of sending uniform commercial emails to Plaintiffs and the Class, which violate CEMA and the CPA in the same way, and from which it may be enjoined as to Plaintiffs and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

115. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendant has violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

116. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action on as a class presents no special difficulties.



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

# VI. CLAIMS TO RELIEF

## First Claim to Relief

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

117. Plaintiffs incorporate and reallege paragraphs 1–105 above.

118. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

119. Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

120. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

121. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents, including because Defendant knew that Plaintiffs and putative members were Washington residents through "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address". RCW 19.190.020(b)(2).

122. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

123. For Defendant's violation of CEMA, Plaintiffs are entitled to all available relief,



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

including an injunction against further violations.

**Second Claim to Relief**

**Violation of the Consumer Protection Act, RCW 19.86.020**

124. Plaintiffs incorporate and reallege paragraphs 1–105 above.

125. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

126. A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

127. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

128. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

129. Defendant is a "person" within the meaning of CEMA. RCW 19.190.010(11).

130. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

131. Defendant initiated the transmission, conspired with another to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendant knew, or had reason to know, were held by Washington residents.

132. Defendant initiated the transmission, conspired with another to initiate the



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

133. For Defendant's violation of the CPA, Plaintiffs and putative class members are entitled to an injunction against further violations; the greater of Plaintiffs' actual damages or liquidated damages of $500 per violation, trebled; and costs of suit, including reasonable attorneys' fees.

## VII. JURY DEMAND

134. Plaintiffs will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII. PRAYER FOR RELIEF

Plaintiffs ask that the Court:

A. Certify the proposed Class, appoint Plaintiffs as Class representatives, and appoint undersigned counsel as Class counsel;

B. Enter a judgment in Plaintiffs' and the Class's favor permanently enjoining Defendant from the unlawful conduct alleged;

C. Enter a judgment in Plaintiffs' and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D. Award Plaintiffs' cost of suit, including reasonable attorneys' fees; and

E. Order such further relief the Court finds appropriate.

*[Counsel signature block to follow on next page.]*



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com

Date: January 28, 2026

Respectfully submitted,

_/s/ Samuel J. Strauss_
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Lynn A. Toops*
Natalie A. Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
ltoops@cohenmalad.com
nyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com

*Attorneys for Plaintiffs*

*** Applications for admission *pro hac vice* forthcoming**

# — EXHIBIT A —

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

MALIKA BENNETT and MARIAH MEADE, on behalf of themselves and on behalf of others similarly situated,

Plaintiffs,

v.

CRICUT, INC.,

Defendant.

No. ______________________________

CLASS ACTION COMPLAINT

EXHIBIT A

| **Date** | **Subject Line** |
|---|---|
| September 23, 2023 | Cricut® Cutting Machine SALE — Ends Tonight. |
| September 21, 2024 | $80 Off Deal Ends Tonight! Save BIG on Cricut Joy |
| June 26, 2025 | Bundle Sale Ends TODAY!! Don't miss up to 40% off |
| December 2, 2024 | Last Chance for Cyber Monday Deals |
| September 10, 2025 | Cricut Maker® 4 bundle deal ends TODAY |
| November 28, 2025 | FINAL HOURS: Black Friday deals are wrapping up |
| December 1, 2025 | LAST CHANCE! Cyber Monday ends tonight |
| March 22, 2025 | Our Bundle Sale Ends TONIGHT 💔 Up to 25% off bundles now! |



STRAUSS BORRELLI PLLC
980 N Michigan Avenue, Suite 1610
Chicago, Illinois 60611-4501
TEL. 872.263.1100 • FAX 872.863.1109
straussborrelli.com